## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| WYATT GRAFF | |
| Plaintiff | Civil Action No.: |
| v. | |
| THE SAVANNAH COLLEGE OF ART AND DESIGN, INC. | **JURY TRIAL DEMANDED** |
| Defendant. | |

## COMPLAINT

COMES NOW Plaintiff Wyatt Graff ("Graff" or "Plaintiff"), by and through the undersigned counsel, and hereby files this Complaint against Defendant The Savannah College of Art and Design, Inc. ("SCAD" or "Defendant"), showing this Court as follows:

## PRELIMINARY STATEMENT AND INTRODUCTION

1.

Plaintiff Wyatt Graff is a graduate of The Savannah College of Art and Design. He was subsequently hired by SCAD as the head coach for the men's and women's golf teams at SCAD's Atlanta campus, where he worked until his termination.

1

From almost the beginning of his career as coach, Graff complained of inequities in benefits and opportunities SCAD provided to its Savannah program and their head coach Amanda Workman ("Workman"), a female.  Plaintiff regularly complained that SCAD provided the Savannah women's team, under Workman, superior access, opportunities and benefits over Plaintiff's Atlanta men's team.  As a result of these inequities, Plaintiff complained that he and his team were inequitably denied the same opportunities to advance and succeed.  For years, up to his termination, Plaintiff similarly complained that Workman was given greater benefits than himself, including pay, assistance and incentives, and that her teams were provided superior and inequitable opportunities for success and advancement. Despite these complaints, and according to the athletic directors to whom he reported, Graff was an excellent coach and his team continued to perform successfully, at least on par with the Savannah teams, if not better.

Rather than reward Plaintiff for his continued success, in response to his legitimate claims of disparity, SCAD fired Plaintiff from his position as head coach. SCAD has claimed that Plaintiff was fired from his coaching position due to his performance.  This claim, however, is nothing more than a pretext – Plaintiff had just finished one of the most successful seasons any coach had had and which rivaled, equaled or bettered the performance of SCAD's Savannah teams.

2

To the contrary, SCAD terminated Plaintiff in retaliation for engaging in protected activity, actual or perceived, namely – complaining about disparities in access, opportunities and benefits between Workman's Savannah women's team and his Atlanta men's team, as well as unequal pay and benefits to Plaintiff, male, personally, as compared to Workman, a female.

Defendant's actions have caused harm to Plaintiff during his tenure through to his firing and beyond, all constituting discrimination and retaliation in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-88 ("Title IX") and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII").

## **JURISDICTION AND VENUE**

2.

Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1337, and 1343.  Jurisdiction for declaratory and other relief is invoked pursuant to 28 U.S.C. §§ 2201 and 2202.

3.

Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (a)(1) and (b)(2), as a substantial number of the events, acts, or omissions giving rise to Plaintiff's claims occurred within the boundaries of this judicial district, and the Defendant is

located in the State of Georgia, operates campuses in Atlanta and Savannah and does business within the Northern District of Georgia such that it is subject to personal jurisdiction in this District.

## CONDITIONS PRECEDENT

4.

On September 11, 2019, Plaintiff timely filed a charge of discrimination based on retaliation, age, and sex with the Equal Employment Opportunity Commission ("EEOC").

5.

On August 7, 2020, the EEOC issued Plaintiff a Notice of Right to Sue ("Notice"), which Notice was received on or about August 12, 2020.

6.

The present action is filed within 90 days of Plaintiff's receipt of his Notice. Accordingly, Plaintiff has complied with all jurisdictional prerequisites to the filing of these claims, having timely filed his charge of discrimination within 180 days of the acts complained of herein, and by filing this suit within 90 days of his receipt of the Notice.

**PARTIES**

7.

Plaintiff is a citizen of the United States of America and an adult resident of the State of Georgia. Plaintiff was employed by Defendant October 19, 2009 to June 10, 2019. He held the titles of Head Men's Golf Coach, Head Women's Golf Coach, and Sports Information Director at SCAD's Atlanta Campus.

8.

Defendant is a private, not-for-profit corporation founded in Savannah in 1978. It is a self-described "art school" operating campuses throughout the world including a campus in Atlanta, Georgia which is within the jurisdiction of this Court. It is headed by founder Paula Wallace who has been the highest paid President of any institution of higher education in the United States.

9.

Defendant receives federal financial assistance and the benefits therefrom. Therefore, all SCAD programs, including intercollegiate athletics, are subject to the requirements of Title IX, must comply with Title IX, and must not permit or engage in sex discrimination in any educational program or activity, including intercollegiate athletics. Indeed, SCAD has promised that it will comply with Title

IX as a condition of its receipt of such federal financial assistance, as required by 34 C.F.R. §106.4.

## THE REQUIREMENTS OF TITLE IX

### 10.

Title IX, enacted in 1972, provides in relevant part:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance...

20 U.S.C. § 1681(a).

### 11.

The Civil Rights Restoration Act of 1987 made plain Congress' intent that "program or activity," as used in Title IX, applies to any program or activity offered by an educational institution that receives federal financial assistance – whether or not the program itself receives such assistance.  20 U.S.C. § 1687.  Because SCAD receives federal financial assistance, its athletic program is subject to Title IX and it must comply with its requirements.

12.

In the statute, Congress expressly delegated authority to the United States Department of Health, Education and Welfare (HEW) to promulgate regulations interpreting Title IX.   20 U.S.C. § 1682.   In 1975, HEW promulgated these regulations at 45 C.F.R. Part 86.   The United States Department of Education ("DOE") later adopted these regulations and codified them at 34 C.F.R. Part 106 (collectively, the "Regulations").   These regulations are enforced by the Office for Civil Rights (OCR) within DOE.   *See* Title IX Regulations at https://www2.ed.gov/policy/rights/reg/ocr/edlite-34cfr106.html.

13.

The Regulations require that federal fund recipients like SCAD undertake remedial and affirmative efforts to eliminate sex discrimination.   34 C.F.R. § 106.3(a) & (b).   They further direct schools to evaluate their own policies and actions; to modify any policies and actions that are discriminatory; and to take remedial steps to eliminate the effects of discriminatory actions.   34 C.F.R. § 106.3(c).   These mandates apply whether or not anyone has complained about discrimination.

14.

On information and belief, Defendant has not undertaken sufficient remedial or affirmative action to remedy the historical and ongoing sex discrimination in its athletic program.

15.

The Regulations include a general prohibition against sex discrimination in 34 C.F.R. § 106.31(a):

    (a) General.  Except as provided elsewhere in this part, no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any academic, extracurricular, research, occupational training, or other educational program or activity operated by a recipient which receives Federal Financial assistance.

16.

The Regulations also include more specific prohibitions in 34 C.F.R. § 106.31(b) that state:

    (b) Specific prohibitions. Except as provided otherwise in this part, in providing any aid, benefit, or service to a student, a recipient shall not, on the basis of sex:

(1) Treat one person differently from another in determining whether such person satisfies any requirement or condition for the provision of such aid, benefit, or service;

(2) Provide different aid, benefits, or services or provide aid, benefits, or services in a different manner;

(3) Deny any person any such benefit or service;

…

(6) Aid or perpetuate discrimination against any person by providing significant assistance to any agency, organization, or person which discriminates on the basis of sex in providing any aid, benefit, or service to students or employees.

(7) Otherwise limit any person in the enjoyment of any right, privilege, advantage, or opportunity.

17.

The Regulations also prohibit sex discrimination in the recruitment of students. 34 C.F.R. § 106.23(a):

(a) Nondiscriminatory recruitment. A recipient to which this subpart applies shall not discriminate on the basis of sex in the recruitment and admission of students. A recipient may be required to undertake additional recruitment

efforts for one sex as remedial action pursuant to §106.3(a), and may choose to undertake such efforts as affirmative action pursuant to §106.3(b).

18.

On information and belief, Defendant has not undertaken sufficient remedial or affirmative recruiting efforts to ensure that it offers male students an equal opportunity to participate in varsity athletics; nor has it provided its women's teams with the resources necessary to adequately recruit female athletes with NCAA Division I athletic skills.

19.

The Regulations include a provision specifically directed to intercollegiate athletics.  34 CFR § 106.41(a) states:

(a) General.  No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person, or otherwise be discriminated against in any interscholastic, intercollegiate, club, or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis.

20.

The Regulations also identify ten (10) non-exclusive areas in which recipients must provide equal athletic opportunity, including:

1. Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;

2. The provision of equipment and supplies;

3. Scheduling of games and practice time;

4. Travel and per diem allowance;

5. Opportunity to receive coaching and academic tutoring;

6. Assignment and compensation of coaches and tutors;

7. Provision of locker rooms, practice and competitive facilities;

8. Provision of medical and training services;

9. Provision of housing and dining facilities and services; and

10. Publicity.

34 C.F.R. § 106.41(c).  A school's "failure to provide necessary funds for teams for one sex" also may be indicative of sex discrimination. *Id*.

21.

The Regulations required compliance with the athletics requirements "as expeditiously as possible but in no event later than three years from the effective

date of this regulation." 34 C.F.R. § 106.41(d).  That compliance deadline was in July 1978.

22.

The Regulations further require that recipients confirm and promise Title IX compliance by filing an Assurance of Compliance with DOE each time they apply for or receive federal financial assistance, as a condition precedent to receipt of federal funds.  34 C.F.R. § 106.4.  The Assurance is a condition precedent to the receipt of federal funds.

23.

On information and belief, SCAD has completed and submitted many Assurance of Compliance forms to DOE and has received federal funds from DOE even though its athletic program has not complied with Title IX since the inception of SCAD Athletics in Atlanta in 2009-2010.

24.

On information and belief, SCAD did not comply with the athletic regulations by the 1978 compliance deadline or at any time thereafter.  Today, more than ten years after the beginning of SCAD Athletics in Atlanta, SCAD still does not fully comply with Title IX.

## FACTS

### SCAD Athletics – Disparities in Resources Directed to Athletics

25.

As further set forth below, Defendant has unlawfully discriminated against the Plaintiff in violation of Title IX with respect to the athletic treatment and benefits in many areas including but not limited to (1) provision of equipment and supplies; (2) scheduling of games and practice times; (3) opportunity to receive coaching and academic tutoring; (4) assignment and compensation of coaches and tutors; (5) provision of locker room, practice and competitive facilities (6) provision of medical and training services; (7) publicity; and (8) recruiting.

### Provision of Equipment and Supplies

26.

Defendant provided the Savannah campus women's golf teams with far superior operating budgets compared to the Atlanta campus' similarly men's golf teams. This allowed the Savannah coaches the opportunity to provide a far better experience including but not limited to the provision of practice equipment and supplies to the Savannah women's golf teams.  The Savannah women's golf team has enjoyed an estimated annual operating budget of nearly 30-50% more than the Atlanta men's golf team. This afforded the women's team a better experience that

was included but not limited to being afforded better uniforms and superior golf equipment. They also enjoyed the competitive advantage of being able to travel and participate in more prestigious golf tournaments. This enabled them to enjoy better publicity, as well as national rankings. Plaintiff's estimate of the amount of fiscal subsidy for the women's team may be low given the fact that for certain years, the Savannah women's team was supplied with a 15-passenger van for tournament travel, an expense that came elsewhere separate and apart  from their allotted operating budget.

Scheduling of Games and Practice Times

27.

Defendant provided the Savannah women's golf teams with far superior operating budgets compared to Atlanta's which allowed the Savannah coaches to schedule higher caliber tournaments, resulting in higher quality competition, which yielded higher national rankings, thus providing the Savannah women's team with a far better experience than the Atlanta men's team.

28.

For the first three seasons of the Plaintiff's employment at SCAD, Savannah had two *head* coaches performing the same duties as the Plaintiff. These coaches were Mr. Fred Fruisen and Ms. Amanda Workman.  Savannah's golfers received far

superior opportunity for individualized attention during both practice and tournaments compared to the Atlanta golf teams as the Plaintiff was solely burdened with coaching and traveling with two teams, as well as responsibilities for updating the athletics website with roster information, articles on the site about tournament, event results, reporting scores to the NAIA, editing photos and headshots, etc. Moreover, Plaintiff had to accomplish this during a working period of only 11 months annually, as opposed to 12 months for Savannah.

29.

Since October of 2012, the Defendant supplied Savannah Director of Golf, Ms. Amanda Workman, with an assistant coach, thus affording the Savannah women's golf teams a host of benefits including more time for individualized coaching and practice time. Because the Plaintiff had to coach both Atlanta teams without an assistant, his teams were disadvantaged.

30.

In order to improve an NAIA golf team's national ranking, strength of schedule is one of the variables considered by Golfstat, the official statistical ranking system utilized in NAIA college golf.  Because Ms. Workman did not regularly travel to competitions with the Savannah men's team, she had the advantage of

taking the Savannah women's team to any college tournament without worrying about when or if the men's team competed.

31.

In contrast to Plaintiff's situation, SCAD provided Ms. Workman a budget which allowed her to regularly compete in NCAA Division I and Division II tournaments. This served to boost her women's team's strength of schedule, thus allowing the Savannah women's teams national ranking to increase as well.

32.

As Plaintiff did not have that same support as Ms. Workman, Plaintiff had to alternate his travel schedule, thus resulting in his inability to travel to advantageous tournaments and thus boost his team's ranking. In a typical fall portion of the golf season, Ms. Workman would take her women's team to three or four tournaments. Ms. Workman's assistant would take the men's team to three or four as well. In contrast, Plaintiff would be required to travel to seven or eight tournaments in the same time span for both Atlanta teams to provide the same experience expected by SCAD. Because of his scheduling restrictions, the Plaintiff had far fewer tournament options for the Atlanta men to compete in. This resulted in the Atlanta men having to miss tournaments which could significantly impact their national and conference rankings.

33.

Additionally, as a result of Ms. Workman's being afforded a far superior operating budget, she did not need to host any tournaments to create revenue to defray operating costs. In contrast, for the Atlanta men's golf team, Plaintiff needed to host home event(s) in order to defray operating costs. Notwithstanding, he could still could not match the amount SCAD provided to the Savannah women's team.

Opportunity to Receive Coaching and Tutoring

34.

Defendant's providing Savannah's Director of Golf, Ms. Workman, with an assistant coach afforded her the opportunity to delegate up to 50% of her coaching duties to someone else. Because of this, the Savannah women's golf team was able to have a coach work with them roughly 20-30% more often than the Atlanta men's golf team. This allowed the Savannah team to develop and progress at a faster rate, thus improving their athletic results.

35.

In a typical golf season, the Plaintiff would be required to travel with one, or both, of the Atlanta teams to 17-19 tournaments during the season. In Savannah, Ms. Workman would travel nine or ten tournaments with the women's golf team and her assistant would travel with the men's team eight or nine times throughout the season.

Assignment and Compensation of Coaches and Tutors

36.

From the Plaintiff's hiring in 2009, Mr. Graff's compensation never compared to the salaries of the SCAD employees completing comparable duties in Savannah. Moreover, Plaintiff was never financially compensated for performing the same duties as his Savannah counterparts.

37.

In August of 2011, Defendant demoted Mr. Graff to an 11-month position, mandating he have a "non-working period" for either the month of July or December, two significant months during the recruitment of collegiate golfers. The Plaintiff's salary was also reduced by one-twelfth. Not one coach in Savannah faced the same demotion.

38.

In August of 2012, the Savannah men's golf coach, Mr. Fred Fruisen, resigned his position. His men's golf coaching duties were given to Ms. Workman. Upon receiving said duties, the Defendant promoted Ms. Workman to the position of Director of Golf and afforded her an assistant coach. Ms. Workman then assigned the men's coaching duties to her assistant coach allowing her to focus her time coaching the women's golf team.

39.

In 2014, the Plaintiff asked SCAD HR exactly what credentials he needed to obtain in order to receive the same title and treatment as Ms. Workman. It was clear to Plaintiff that SCAD recruits who were considering both SCAD locations would view Ms. Workman as a more credentialed coach with more in terms of resources, notwithstanding the fact that both the Plaintiff and Ms. Workman were performing the same duties. HR never responded to the Plaintiff's inquiry.

Practice and Competitive Facilities

40.

Defendant provided the Savannah women's golf teams with far superior operating budgets compared to Atlanta's. Atlanta Athletics Director, Glen Hill, and Dean of Students, Art Malloy, viewed the operating budgets for the Savannah teams. They described the disparity to the Plaintiff as "significant – maybe 25-40% difference". This budgetary inequity, amongst other things, allowed the Savannah team to practice at far superior golf facilities compared to Atlanta.

41.

The Savannah team practiced at Savannah Harbor, a Troon golf course which hosted a Senior PGA event annually. Savannah Harbor also paired with Savannah

Quarters, located in Pooler, Georgia. Both top rated golf courses were a fifteen or twenty-minute drive from downtown Savannah.

42.

In contrast, from 2010-2019, the Atlanta team practiced at Charlie Yates Golf Course (an "executive" course – far shorter in length than a standard golf course), Heritage Golf Links or Legacy Golf Links (another executive course) during Monday through Thursday. On Friday, the Atlanta teams traveled to The Oaks or a ClubCorp course, all of which were never less than a forty-five-minute drive from Midtown Atlanta. None of the Atlanta golf facilities utilized compared to the caliber of Savannah's golf venues as the budget simply would not allow.

43.

This disparity allowed Savannah to have a distinct recruiting advantage over the Plaintiff while recruiting for his Atlanta team. As could be imagined, the Savannah team enjoyed a distinct developmental advantage by having the availability to practice on full-length courses more often.

Provision of Medical and Training Services

44.

Ms. Workman's women's golf teams benefited greatly from having access to full-time, certified trainers from Memorial Health University Medical Center and a

20

team physician from Chatham Orthopedics Associates. These physicians were situated at team facilities during all home events as well as prior to, during and after team practices.

45.

Comparatively, the Atlanta team leased a physician from a local pool of sports medicine trainers. Said trainer was available in a limited fashion, typically three to four hours, a few days each week. In several instances, the Director of Athletics (AD), Mr. Glen Hill, would perform different massage and stretching procedures on the student-athletes.  In contrast to the situation in Savannah, AD Hill has no sports medicine certification or credentials.

46.

Ms. Workman's team also benefitted greatly from the employment of Mr. Sam Carter, the Director of Fitness and Head Strength and Conditioning Coach, who regularly supervised and trained the Savannah golf teams. Mr. Carter is a member of the National Strength and Conditioning Association and is certified through the NSCA as a certified Strength and Conditioning Specialist. Mr. Carter is also certified as a personal trainer through ACE and a former Marine.

47.

SCAD did not provide the Atlanta golf teams with any type of strength and conditioning coach.

48.

In March 2012, Mr. Avard Moncur, SCAD's part-time men's and women's cross country coach in Atlanta, performed the duties of Interim Director of Fitness, Intramurals and Recreation for three months until he officially applied for the open position in May/June of 2012. Mr. Moncur has a degree in Health and Human Performance from Auburn University, a USA Track and Field (USATF) coaching certification and was a three-time Olympian medalist in the 400m at the time he applied for the position.

49.

Instead of hiring Mr. Moncur, SCAD opted to transition a Savannah employee, Leslee LeBouton, to the Director of Fitness, Intramurals and Recreation position in Atlanta. At the time of her transition, Ms. LeBouton possessed no training certification and had never attended college. Prior to working at SCAD, Ms. LeBouton was employed as the nanny utilized by SCAD's President, Paula Wallace. Upon arriving in Atlanta, Ms. LeBouton explained to the Plaintiff that she had just broken up with her longtime boyfriend in Savannah and was looking for a new start

in Atlanta. Upon information and belief, Ms. LeBouton continues to perform her nanny duties for President Wallace and her husband, Mr. Glenn Wallace. It is quite common for Ms. Lebouton to take Trace Wallace or Madison Wallace for errands during the work day.

50.

During the six years after Ms. LeBouton's transition to Atlanta, she never trained or worked with any of the men's or women's golfers in Atlanta. Any training that the golfers received came from the Plaintiff.

Athletics Publicity

51.

At the time of the Plaintiff's hire in 2009, Savannah employed a full-time individual, Mr. Mike MacEachern, to promote and gain publicity for SCAD Savannah Athletics. Referred to as a SID, this position's responsibilities include updating the athletics website with roster information, articles on the site about tournament, event results, reporting scores to the NAIA, editing photos and headshots, etc.  Conversely, SCAD required the Plaintiff to perform those very same SID duties for all of the Atlanta sports teams along with his coaching duties in order to be considered "full-time".

23

52.

Savannah's golf teams benefited greatly from having one person whose sole responsibility was the promotion of Savannah Athletics. In contrast, the Plaintiff had to balance the rigors of training and traveling with two golf teams, recruiting new student-athletes for the golf teams as well as maintain the Atlanta Athletics website with articles and score reporting for Atlanta's six athletic teams all within an 11-month employment period.

53.

During the Plaintiff's tenure at SCAD, there have been three SID's hired in Savannah, all with the sole responsibility of promoting Savannah Athletics. At different times, there have also been student workers assigned to help with the SID duties.

54.

In 2015, SCAD removed the Plaintiff's SID duties and assigned them to the Director of Athletics position. There has never been a SID hired whose sole responsibility was the promotion of SCAD Atlanta Athletics.

Recruiting

55.

Savannah's golf teams benefitted from having greater operating budgets to allow for the recruitment of student-athletes. The significantly higher budget did not just allow for more appealing and superior practice facilities and trainers, but it allowed the Savannah coaches to provide better treatment to recruits and families, particularly for women golfers.

56.

Because Ms. Workman delegated the men's golf duties to her assistant coach, the Plaintiff's recruiting duties were twice that of Ms. Workman.

57.

The Plaintiff's recruiting efforts were also hindered in contrast to Ms. Workman's because of his required "non-working period", a month in which he was told by SCAD HR that he was not to respond to emails, use SCAD facilities, or do any work for the benefit of SCAD during this month off.

The SCAD Dynamic

58.

According to SCAD's academic website (www.scad.edu), SCAD claims that "SCAD is one university – offering degrees in Atlanta and Savannah, Georgia, Hong

Kong, and online via eLearning, with additional study abroad opportunities in Lacoste, France and other locations. Each SCAD location provides a new experience, and Students can choose to study in any location, at any quarter during their education." Further, "Each SCAD location offers a specified set of degree programs tailored to its unique urban context. But no matter what location your degree is offered, you have the ability to explore them all by taking foundation studies, general education courses, electives and more in Atlanta, Hong Kong, Savannah or Lacoste."

59.

SCAD is accredited by The Southern Association of Colleges and Schools Commission on Colleges (SACSCOC). This accreditation includes both Savannah and Atlanta locations. The last accreditation affirmation occurred in 2010 and is due for renewal in 2020. SCAD is a 501c3, not for profit organization.

60.

While SCAD has Admission departments in both Savannah and Atlanta, their recruitment systems are linked. Admission representatives recruit for SCAD in general, not just the location at which they are situated. When Atlanta students receive a letter of acceptance to SCAD, they receive a letter from Admission in Savannah. When a student graduates from Atlanta, their diplomas state the

graduation date and the location is "Savannah". Notwithstanding, as experienced by Plaintiff, resources have been provided and/or withheld in a discriminatory fashion, oftentimes dictated by President Wallace's personal whims.

61.

Student-athletes are allowed the opportunity to take eLearning classes each quarter. SCAD Atlanta students, student-athletes and, more specifically, golfers, are offered the opportunity to enroll in an eLearning class taught by a professor in Savannah each quarter. There have been instances in which Savannah and Atlanta student-athletes have been enrolled in the same eLearning classes with the same professor.

62.

SCAD's academic website claims that SCAD has 14,000 students from all 50 states and more than 100 countries. These numbers include students at both Atlanta and Savannah. SCAD's tuition is the same regardless of whether a student attends Atlanta or Savannah.

63.

Savannah and Atlanta Athletics share a common Athletics website: www.scadathletics.com. It claims to be "…the official website of SCAD Athletics. When on the shared site, there is a landing page that allows the viewer to choose

27

which athletics department he/she would like to view, Savannah or Atlanta. As of April 19, 2020, both websites used the image of a Savannah golfer, female sophomore Alessia Avanzo, to promote donations to SCAD (N/A, Savannah, eLearning, Atlanta, or Hong Kong). A donation does not necessarily have to go to "athletics" or a specific department, and could also go towards an academic scholarship. The default donation would go to "Unrestricted Support Savannah".

64.

Additionally, in the downloadable Student Athlete Handbook from Atlanta's portion of the site, the handbook directs all Atlanta student-athletes in need of sports medicine therapy to "Turner Training Room" in Savannah. It states that all medical information is to be sent to SCAD in Savannah.

65.

Several Savannah employees manage and supervise employees in Atlanta. SCAD Communications is based in Savannah. In addition, several Savannah employees have "transitioned" to Atlanta without having to formally apply or interview for a position.

66.

During a typical academic year, Atlanta student-athletes are required to attend functions in Savannah. Atlanta student-athletes are also able to use their meal plan and/or money on their SCAD card to purchase food in Savannah.

67.

Savannah personnel often make decisions for the Atlanta location, notably Atlanta Athletics. In 2009, Atlanta applied for acceptance into the National Association of Intercollegiate Athletics (NAIA). SCAD President, Ms. Paula Wallace, and SCAD Vice President for Student Success, Dr. Phil Alletto, both attended and played integral roles in this acceptance process. Dr. Alletto also played an important role in Atlanta's acceptance into the Appalachian Athletic Conference (AAC) in 2012. Dr. Alletto also approved of team spending, personnel hiring and made other decisions for the Atlanta Athletics Department in the discriminatory fashion as complained herein by Plaintiff.

68.

Dr. Alletto has significant oversight of Athletics at both Savannah and Atlanta. A 2017, SCAD organizational chart clearly shows that "Athletics" falls directly under the management of Dr. Alletto. It also reveals that Athletics does not fall under the purview of "Dean of Students".

President Paula Wallace's Favoritism of Women's Athletics in Savannah

69.

In 2006, SCAD acquired Richard Arnold High School in Savannah. Before renovating it, SCAD President Paula Wallace toured the facility, most notably to view a WPA-era mural, uncovered by preservationist, Mr. Bob Dickensheets. In an article titled "Where Are the Women?" published for *South Magazine* in February of 2018, Ms. Wallace states that upon first view of the "robust, masculine profiles…I had but one nagging question: Where are the women?" Ms. Wallace continues in the article to make claims as, "The world cries out for female heroes!" and, "The stories of heroic women in Savannah have long needed telling."

70.

A decade after noting this historical slight to females, President Wallace, through SCAD, created the Savannah Women of Vision Investiture. Ms. Wallace explains, "Savannah as we know it rests on the triumphs of its women – mothers, entrepreneurs, authors, patriots, philanthropists. I created the Savannah Women of Vision investiture to illuminate trailblazers and their transcendent work, keeping their names and deeds not only in our hearts but publicly acclaimed. These are our heroines."

71.

In addition, according to SCAD's 2017 tax returns, SCAD annually donates $10,000 to the National Museum of Women in the Arts, an entity of which Ms. Wallace is a member of the National Advisory Board.

### Wyatt Graff's Career: A Case Study in Retaliation

72.

Simply stated, SCAD has discriminated and retaliated against the Plaintiff because Coach Graff was a male employee at SCAD's Atlanta location, a location that SCAD never wanted to have the same resources as or better performance than SCAD Savannah's female golf team.

### Coach Graff Begins Work at SCAD

73.

Mr. Graff attended SCAD as a student from 1997-2001. Mr. Graff competed on the men's golf team at SCAD from 1997-2001. During that time, Mr. Graff was named Scholar All-America from the Golf Coaches' Association of America (GCAA) and graduated summa cum laude with a 3.96 GPA with a BFA in Illustration. Mr. Graff was a member of the first-ever SCAD golf team to qualify for the NCAA Division III National Championships in Massachusetts in 1999. He returned to SCAD from 2003-2005 to complete his MFA Painting degree.

74.

On October 19, 2009, Plaintiff accepted the 12-month, full-time position of Head Men's and Women's Golf Coach and Sports Information Director at SCAD's Atlanta location. His salary was roughly $38,500. At that time, SCAD's Savannah's location had three employees performing the same duties as the Plaintiff: Fred Fruisen (1997), Amanda Workman (2001), Michael MacEachern (2002). Mr. Fruisen was Head Men's Golf Coach. Ms. Workman was the Head Women's Golf Coach and Mr. MacEachern was the SID.

75.

In November of 2009, SCAD sent Mr. Graff to Savannah to meet with both Ms. Workman and Mr. Fruisen to train and to learn the parameters of coaching SCAD golf teams. Then in December of 2009, Mr. MacEachern traveled to Atlanta to train Plaintiff on how to perform SID duties. In addition to these training sessions, Plaintiff also served as Savannah's Head Golf Coach on two different occasions and as assistant coach at the NAIA Men's Golf National Championship in Silvis, Illinois thus proving that SCAD's employees were interchangeable, regardless of location of employment.

76.

During Plaintiff's first few years of employment at SCAD, after being asked
to speak to SCAD's 2010 incoming freshmen class at orientation, he was viewed as
a "rising star, being fast-tracked" according to colleague Denise McFall, Atlanta's
Editorial Director.

77.

Between 2010 and 2013, SCAD purchased over $35,000 of Plaintiff's artwork
to hang in SCAD's Digital Media Center and SCAD's main building at the Hong
Kong location. After 2013, when Plaintiff complained to HR pursuing equality and
lawful treatment, SCAD never purchased another of Plaintiff' artwork. In fact, after
being selected as a finalist by Atlanta Falcon's owner, Mr. Arthur Blank, to create
six large-scale paintings for the Mercedes-Benz Stadium, SCAD never followed
through on their end in extending a contract to Plaintiff to create said artwork.

<u>Disparity and Discrimination Revealed to Plaintiff</u>

78.

In August of 2011, Atlanta's Dean Malloy held a departmental retreat at a
local Atlanta hotel for the Office of Student Success and Advising ("Student
Success"). Because Athletics was considered part of Student Success, all coaches
were required to attend. At this retreat, Savannah's Dr. Alletto attended, critiqued

several presentations made by Student Success members, and he discussed upcoming "change" and how, as SCAD employees, to handle "change".

79.

Later that month, SCAD informed Plaintiff that he would be reduced to an 11-month employee and that his salary would reflect this reduction. Mr. Graff privately spoke to Dean Malloy about how this would negatively affect recruiting and weaken the development of the Atlanta athletic teams. Mr. Graff told Malloy that December was an ideal month to host recruits since most high schoolers would be out of school and able to travel. Malloy told him that there was nothing that could be done. When Mr. Graff called Mr. Fruisen in Savannah to update him on the development, it was discovered that none of the Savannah coaches were reduced to 11-month positions.

80.

In March of 2012, Kendall Reid, the Director of Fitness, Intramurals, and Recreation in Atlanta resigned from his position. As his teams' seasons were complete and given his extensive athletic background, Atlanta's part-time cross-country coach, Avard Moncur assumed Reid's duties for the remainder of the academic year until early June when he officially applied for the position. Moncur had graduated from Auburn University with a degree in Health and Human Performance, was a certified coach from USA Track and Field and knew all the

Atlanta student-athletes very well. To Mr. Graff and Mr. Moncur, his promotion seemed like a certainty.

81.

In late July/early August of 2012, however, while Mr. Moncur was competing in his fourth Olympic Games in London, Ms. Leslee LeBouton was hired to fill the role of Director of Fitness, Intramurals, and Recreation in Atlanta. Ms. LeBouton had worked in Savannah Athletics for about five years after serving as the personal nanny to the two adopted children of SCAD President, Paula Wallace. LeBouton was Savannah's Director of Intramurals and a fitness coordinator. At the time of her hire, Ms. LeBouton had no certification for athletic training nor had she ever attended college.

82.

During that same summer of 2012, Dean Malloy informed Mr. Graff that AD/Head Men's and Women's Tennis Coach, Brad Iftner had resigned from his position. Malloy told Plaintiff that he should be prepared to take the reigns as Atlanta's new Athletic Director.

83.

Upon returning to work the following Monday, Plaintiff went to meet with Dean Malloy to discuss the new position. When Mr. Graff arrived at Dean Malloy's

office, Malloy informed him that SCAD's plans had changed and that Graff would no longer be promoted to the position. Malloy apologized and said that Dr. Alletto was transitioning Savannah's Associate AD, Stephany Raines, to be Atlanta's AD.

84.

Just prior to Iftner's departure, SCAD terminated their Director of Athletics, Mr. Steve Larsen. Instead of promoting their Associate Athletic Director, Stephany Raines, to fill the Savannah position, Dr. Alletto promoted the former baseball coach, and good friend, Doug Wollenburg into Savannah's AD role vacated by Larsen's departure. Raines, a black female, complained that she was overlooked. Subsequently, Alletto had Malloy terminate Atlanta's Athletics Director, Brad Iftner, to create an AD vacancy. Though Graff was intnitially slated for the position, it was given to Raines.

85.

Confused by the developments and wondering why he was not afforded the opportunity to apply for the position, Mr. Graff went to Atlanta Vice President P.J. Johnson to inquire as to why things transpired as they did. VP Johnson claimed that Savannah was eliminating the position of an Associate Athletics Director which meant that SCAD was required to offer a similar position to Raines. He described it as a "transition" and that posting of the position was not required.

86.

Within days of meeting with VP Johnson regarding Ms. Raines' promotion, Mr. Graff also received news that Savannah men's golf coach, Coach Fruisen, was resigning from his position to take a men's coaching position at NCAA Division III power, Skidmore College.

87.

Instead of hiring a new coach to replace Fruisen, SCAD promoted Ms. Workman to a newly created position of Director of Golf in which she would oversee both the men's and women's golf teams.

88.

Soon after, in October of 2012, SCAD hired former Savannah men's golfer, Mr. Clint Colbert, as the newly created assistant coach position under Ms. Workman.

89.

Mr. Colbert later confided in Graff that at his time of hire, Ms. Workman delegated almost all men's coaching duties to Colbert. Ms. Workman stated that Colbert was to practice and travel with the men's team and basically perform all the duties of a head coach. This delegation of duties allowed Workman to maintain her focus on the female team which she had been building since she started at SCAD.

90.

That 2012-13 season marked AD Raines' first season at the helm of the Atlanta department. In one of the first meetings she held during the year, Ms. Raines informed all of the Atlanta coaches that if she was going to be in charge, then the Atlanta teams were going to get the same amount of scholarships as Savannah. According to Raines, for the first two seasons of competition, SCAD had only allotted the Plaintiff four full-scholarships and one academic exemption to offer to the members of each of his teams. In contrast, Savannah had been allowed five full-scholarships and one academic exemption. In theory, that could be a differential of roughly $50,000 per team. That was a 20% advantage for each Savannah golf teams over the Atlanta teams. From the inception of the Atlanta golf team, with the Plaintiff performing the work of three people in Savannah, SCAD placed the Plaintiff at a competitive and professional disadvantage compared to Ms. Workman.

91.

In late fall of 2013, the Plaintiff had witnessed enough favoritism for Savannah females and contacted SCAD HR representative, Ms. Katie Reaves, with an inquiry about his salary compensation compared to that of Ms. Workman. Mr. Graff met with Ms. Reaves and claimed that because he and Ms. Workman completed the same duties for the same company with the same manager, that he

should be afforded the same treatment and opportunity to succeed. The Plaintiff claimed that Ms. Workman's having the availability to delegate half of her responsibilities to an assistant coach was a huge competitive and professional advantage. The Plaintiff also claimed that Ms. Workman's title of Director of Golf carried a connotation that provided her with an advantage when recruiting student-athletes. Mr. Graff also complained that all the Atlanta coaches were at a disadvantage because Savannah had certified personnel to expertly train the athletes while Atlanta employed nobody in that capacity. Ms. Reaves said that she would do some investigating and get back to Mr. Graff.

92.

As referenced herein before, in December 2013, Mr. Graff's was not allowed to work as a result of his reduced schedule. Accordingly, prior to the month's start, Mr. Graff paid all the tournament entry fees for the remainder of the 2013-14 academic year and cleaned out most of his office to tidy up his space for his break. As Mr. Graff was leaving the office to begin his non-working period, Ms. Raines inquired if he intended on coming back to SCAD in January. Mr. Graff responded that he was unsure and that he felt that things would never be in his favor. Mr. Graff had a newborn son at home and was routinely working fifty to eighty hours a week to perform his required duties. Ms. Raines said that she would see what she could

do. She told him that she could probably get him an increase of $4,000. Upon his return, the Plaintiff had his annual salary increased by Mr. Raines in the amount of $4,000, claiming that it was "a market assessment."

93.

Notwithstanding the increase, Plaintiff remained aware that he was still at a huge disadvantage compared to Ms. Workman. On January 18, 2014, the Plaintiff created a chart that compared his duties to those of Ms. Workman and sent the chart to SCAD HR. The chart overwhelmingly conveyed the disparate treatment between Mr. Graff and Ms. Workman. For example, because SCAD provided Ms. Workman with an assistant, Mr. Graff was traveling nearly twice as often as she.

94.

Mr. Graff also pointed out that he remained an 11-month employee and was still required to perform SID duties to be considered full-time. Notwithstanding, Mr. Graff had won a conference championship and received Coach of the Year honors from the Appalachian Athletic Conference (AAC). Most notably, he conveyed that he had to travel to compete in eighteen tournaments compared to Ms. Workman's ten and Colbert's nine. Mr. Graff continued to press SCAD HR for answers to the disparate treatment, including what her perceived to be a large disparity in his pay compared to Workman.

95.

Moreover, just over a year prior, Graff had been told he was going to be promoted to the Atlanta Athletics Director position that would have nearly doubled his salary. He subsequently learned that it would not happen as it was given to a female from the Savannah campus.

96.

Furthermore, Plaintiff watched as his Savannah counterpart, Ms. Workman, was promoted to a newly created position of Director of Golf, received an assistant coach to alleviate the demands of her new title and continued to get competitive advantages that were not afforded to him.

97.

Mr. Graff's Atlanta team was also at a huge competitive disadvantage because President Wallace's nanny was hired to run the Atlanta gym, lacking any credentials whatsoever in terms of training athletes.

98.

During another meeting with Ms. Raines in early June, 2014, Plaintiff expressed frustration over the disparate treatment of the Savannah golf teams compared to that of the Atlanta teams and expressed particular frustration over the opportunities afforded to the Savannah women's golf team. Ms. Raines responded

that if he continued with his constant complaining to HR, SCAD might just cancel Atlanta Athletics altogether.

99.

At this point, Plaintiff had written to, or met with, SCAD HR in late October (2013), January (2014) and March (2014) regarding his concerns of disparity between him and Ms. Workman.

100.

Mr. Graff was so dumbfounded by the threat, that he emailed the SCAD Ombudswoman, fearing retaliation. Plaintiff wanted an unbiased resource to know that the unscheduled meeting had transpired. The Ombudswoman wrote back that she was not allowed to keep records of emails, but Mr. Graff had proof of a "sent email" and that would suffice for his records. From that moment on, Graff feared retaliation from SCAD.

101.

Later that summer, Mr. Graff asked HR that his SID duties be removed. Having to coach two golf teams without an assistant for 11 months was still far more than Ms. Workman had to do. Mr. Graff felt that SCAD would acquiesce. This proved not to be the case. Instead, Mr. Graff was reminded that he had been assigned a work-study position for help. As the Plaintiff explained to both Dean Malloy and

Ms. Raines, because of his travel and practice requirements for golf, Mr. Graff was seldom in the office to even train a work study. Furthermore, the two work study students that were assigned to Mr. Graff completed more work for Ms. Raines than for the Plaintiff.

102.

In November of 2014, Mr. Graff called SCAD's Title IX Coordinator, Ms. Judith Van Baron in Savannah. Through his continued research, Mr. Graff felt that because SCAD viewed itself as one entity with one manager making decisions for both locations that there could be a Title IX compliance issue. He communicated his concern to Ms. Van Baron who emailed Mr. Graff in December of 2014 to inform him that his concern was not a Title IX compliance issue, but that he could talk with HR for review of his pay.

103.

Following Ms. Van Baron's directives, Mr. Graff contacted SCAD HR representative, Ms. Nickie Green, on Thursday, December 4, 2014, about the pay disparity and advantages Ms. Workman received compared to him. In January of 2015, Ms. Green responded that an extensive investigation took place and that SCAD found no evidence of gender or pay discrimination or inequity, though no evidence or proof was provided by Ms. Green. Ms. Green said that because Ms.

Workman was employed in Savannah and competed in a different conference, it was "like comparing apples to oranges". However, in March of 2015, clearly to pacify Plaintiff, Ms. Green informed Mr. Graff that he would be returned to a 12-month position effective March 1, 2015 and that his salary would adjust to $47,281.27.

104.

In June of 2015, Dr. Alletto announced that SCAD Athletics in both Atlanta and Savannah would expand in the fall of the 2016 academic year. On September 29, 2015, because of the increase in the number of teams and the corresponding workload, SCAD HR notified Mr. Graff that he would be relieved of his SID responsibilities with no reduction in pay and that the SID duties would ultimately be reallocated to a new Athletic Director.  However, Plaintiff continued to voice his concerns over the myriad disparities while being required to perform the SID duties through March of 2016.  He also continued to write articles and post scores to the website as mandated by the new Athletics Director in Atlanta, Glen Hill.

105.

At the 2017 NAIA Women's Golf National Championship, the disparate treatment between SCAD's Savannah and Atlanta program were in clear view not only to Plaintiff, but also to his golfers. Upon arriving at the championship site, the Atlanta team noticed a white, 15-passenger van arrive with a giant bee and "SCAD

Athletics" emblazoned on the side of the van. Conversely, the Atlanta team was required to locate and rent whatever non-descript 15-passenger van Enterprise Rent-a-Car had in stock for them.

106.

Savannah Athletics Director, Doug Wollenburg, confirmed that SCAD provided the Savannah teams with vans to drive to practice and to competitions. This ability to have free transportation to both practice and tournaments throughout the year would equate to a $6,000-$10,000 advantage for Ms. Workman's golf teams.

107.

When new Atlanta Athletics Director, Mr. Glen Hill. inquired with his counterpart in Savannah where the funding for those vans came from, Wollenburg claimed he did not know, but that it did not come from any Athletics budget.

108.

During the 2017-18 season, Mr. Graff came across an organizational chart posted on the www.scad.edu website that showed a precise hierarchy of SCAD. Dated January 27, 2017, the chart clearly showed that Dr. Phillip Alletto, based in Savannah, had direct managerial and decision-making authority over both Atlanta and Savannah Athletics.

109.

On June 7, 2017, Mr. Graff wrote to HR representative Ms. Nickie Green and cc'd Dean of Students Malloy and AD Glen Hill with a link to the chart and reiterated his claims made over the previous years that he felt the disparate treatment needed to be rectified. On June 8, 2017, Ms. Green acknowledged receipt of the email and said that she would forward it to the appropriate people. Mr. Graff had even gone as far as to print out a copy of the Equal Pay Act definition from the Equal Employment Opportunity Commission and gave it to Ms. Green.

110.

Prior to the 2018-19 golf season, abrupt change occurred in the dynamic of leadership in Student Success in Atlanta. Mr. Art Malloy, the Dean of Students in Atlanta abruptly resigned from his position at SCAD. On information and belief, Mr. Malloy had recently reported a SCAD executive to HR for a serious allegation of misconduct. With SCAD's 2020 accreditation review forthcoming, if such allegations were on record or brought up during this process, it could potentially place SCAD's most significant accreditation in doubt.

111.

Within a few days, Dr. Alletto appointed Savannah employee, Mr. Luke Buckovich, to replace Malloy as Atlanta Dean of Students. This did not sit well with

several staff members in Atlanta. Buckovich had not even worked for SCAD for a year. He had no experience as a Dean nor did he even have a master's degree. However, he was the son of Savannah Vice President, John Buckovich, who was also a close friend of Dr. Alletto's in Savannah.

112.

All the while, Plaintiff continued to voice his complaints that both he and his teams were being treated unfairly and provided unequal access, opportunities and advantages, including to the terms of his own employment. Upon information and belief, refusing to investigate or rectify these complaints, and concerned that Plaintiff's complaints could harm the upcoming accreditation review, SCAD devised a plan to terminate Plaintiff.

Mr. Graff's Termination

113.

On Monday, June 10, 2019, Mr. Graff received an unexpected email from Dean of Students, Luke Buckovich. Mr. Buckovich asked if Graff was available for a meeting that day at 2:30 p.m. The Plaintiff responded that he was available and would see him there.

114.

Upon arriving in Mr. Buckovich's office, Mr. Graff was greeted by Dean Buckovich , Athletic Director Hill and HR representative, Ms. Nickie Green. Green informed the Plaintiff that effective immediately, SCAD the organization was terminating him from his employment as Head Men's and Women's Golf Coach in Atlanta.

115.

Mr. Graff asked why he was being fired and Ms. Green replied "performance".  Plaintiff then provided Green and all present with his chronicle of team successes both on the golf course and in the classroom, historically and, specifically over the past season as compared to Ms. Workman's teams' performance.

116.

Ms. Green did not respond with any specifics other than reiterating "performance" as SCAD's reasoning for terminating Plaintiff.  Instead, Green informed Graff that SCAD would rehire him for one of two available positions in Admissions at the same salary. Mr. Graff said that he would consider the positions and left the office.

117.

After returning to his office, AD Hill met with Plaintiff and explained that he had only found out that morning what was about to transpire. Because Plaintiff reported directly to Hill, it was highly unusual that Plaintiff's termination would not be discussed, much less executed, absent any input from Hill.

118.

Upon returning home that evening, Mr. Graff called his former Dean of Students, Mr. Art Malloy, to explain what had transpired.  Mr. Malloy affirmed that Plaintiff had performed as best as he possibly could and that performance could not possibly be a valid reason for his termination.  Malloy also commended Plaintiff for his performance, despite having "one hand tied behind his back."

119.

Mr. Graff also called another SCAD employee who advised Mr. Graff similarly to Mr. Malloy. The employee also told Mr. Graff that SCAD's offer to work in Admission was their way of making life miserable and forcing him to leave on his own. Alternatively, SCAD would give Mr. Graff an unattainable quota and terminate him with provable cause.

120.

After asking around to other SCAD employees, Mr. Graff discovered that a former SCAD employee in finance and accounting, Mr. Andrew Su, had utilized SCAD HR's Open-Door Policy to complain about some derogatory language used by an executive on the fifth floor of SCAD Atlanta. The next day, said Mr. Su was terminated from his position in finance and offered a similar position in Admission as was made to Mr. Graff.  This is yet another example of Defendant's systemic motive and intent of penalizing employees from utilizing SCAD's Open Door Policy and engaging in protected activity only to be terminated from their current position of employment.

Post-Firing

121.

In the days after his termination, Mr. Graff stayed in touch with AD Hill. Hill went as far as to tell the Plaintiff that "this isn't about performance…it can't be…unless they are crazy."

122.

Within a few days of the Plaintiff's termination, Mr. Hill informed him that upon his leaving the termination meeting on June 10, 2019, Ms. Green stated that "perhaps performance was not the best way to go" regarding Mr. Graff's

termination. Three months after Mr. Graff's termination and after over fifteen years as an employee at SCAD, Ms. Green no longer works for SCAD.

123.

During his tenure at SCAD, one of Mr. Graff's most common and vocal complaints against SCAD was the fact that they provided Ms. Workman with an assistant coach. These complaints, which were consistently vocalized throughout his employment, illustrated the disparities not only in the terms of his own employment vis-a-vis Workman, but the advantages, opportunities and benefits Worman was provided for her women's team as opposed to what SCAD provided Plaintiff for his men's team.

## CAUSES OF ACTION

## COUNT ONE:

**Sex Discrimination on the Basis of Plaintiff's Sex in Violation of the Education Amendments Act of 1972 (Title IX), 20 U.S.C. §§ 1681, *et seq.***

124.

Paragraphs 1 through 123 above are hereby incorporated as though each of the factual allegations was restated.

125.

Title IX and its implementing regulations prohibit a recipient of federal funding from discriminating against an employee in education-related employment

51

on the basis of sex, including in rates of pay or any other form of compensation and

changes in compensation, job assignments, fringe benefits available by virtue of

employment, employer-sponsored activities, including those that are social and

recreational, termination, and any other term, condition, or privilege of employment.

34 C.F.R. §106.51 (Nov. 13, 2000).

126.

At all times relevant to this Complaint, Defendant was an employer and a

recipient of federal funding within the meaning of Title IX and its implementing

regulations.

127.

At all times relevant to this Complaint, Plaintiff was an education-related

employee of a recipient of federal funding within the meaning of Title IX and its

implementing regulations.

128.

Defendant discriminated against Plaintiff because of his sex (male) by

subjecting him to disproportionate funding for his teams (provision of equipment

and supplies; scheduling of games and practice times, opportunities for coaching and

academic tutoring, assignment and compensation for coaches and tutors, provision

of locker rooms, practice and competitive facilities, provision of medical and

training facilities, transportation and travel, publicity and recruiting) in a manner that adversely affected the terms and conditions of his employment, paying him less than similarly situated female coaches, subjecting him to disparate treatment and disparate discipline, and terminating his employment because of sex. Defendants actions constitute discrimination in violation of Title IX and its implementing regulations.

129.

Defendants actions described above have directly and proximately caused, and continue to cause, Plaintiff to suffer loss of income and other financial benefits, a loss of future professional opportunities and future income, pain and suffering, humiliation, personal embarrassment, and damage to his professional reputation.

## COUNT TWO:

### Unlawful Retaliation in Violation of Title IX of the Education Amendments Act of 1972, 20 U.S.C. §§ 1681, *et seq.*

130.

Paragraphs 1 through 129 above are hereby incorporated as though each of the factual allegations was restated.

131.

Title IX and its implementing regulations prohibit retaliation against an employee for her opposition to Title IX discrimination or participation in a Title IX proceeding.

132.

At all times relevant to this Complaint, Defendant was an employer and a recipient of federal funding within the meaning of Title IX and its implementing regulations.

133.

At all times relevant to this Complaint, Plaintiff was an education-related employee of a recipient of federal funding within the meaning of Title IX and its implementing regulations.

134.

Plaintiff engaged in protected activity by opposing treatment that he reasonably believed constituted unlawful discrimination under Title IX  and its implementing regulations, including opposing and reporting Defendant's disparate funding and treatment of the Atlanta men's team and opposing and reporting discrimination on the basis of sex in employment in a federally funded education program.

135.

Defendant was aware of Plaintiff's protected activity.

136.

Defendant took adverse action against Plaintiff, including refusing to investigate his complaints and terminating his employment.

137.

The adverse actions taken by Defendant against Plaintiff were casually connected to Plaintiff's protected activity.

138.

Defendant's actions described above have directly and proximately caused, and continue to cause, Plaintiff to suffer loss of income and other financial benefits, a loss of future professional opportunities and future income, pain and suffering, humiliation, personal embarrassment, and damage to her professional reputation.

## COUNT THREE:

**Discrimination and Hostile Environment On the Basis of Sex in Violation of 42 U.S.C. § 2000e, et. seq.**

139.

Paragraphs 1 through 138 are hereby incorporated as though each of the factual allegations was restated.

140.

Defendant's actions as described above created a hostile environment for Plaintiff and discriminated against Plaintiff all on the basis of his sex and constitute willful violations of Title VII of the Civil Rights Act of 1964, as amended, entitling Plaintiff to all relief afforded by the statute, including punitive damages.

## COUNT FOUR:

## RETALIATION IN VIOLATION OF 42 U.S.C. § 2000e *et. seq.*

141.

Paragraphs 1 through 140 above are hereby incorporated as though each of the factual allegations was restated.

142.

Plaintiff's engaged in protected activity when he complained of disparate pay and treatment between himself and Workman, as well as the opportunities afforded to Plaintiff's teams as opposed to Wormnan's teams and which he reasonably perceived to constitute unlawful discrimination under both Title IX and Title VII.

143.

Defendant's response to Plaintiff's complaints, termination, constitutes unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964, as

amended, entitling Plaintiff to all relief afforded by the statute, including punitive damages.

## **COUNT FIVE:**

### **Claim for Expenses of Litigation under O.G.C.A. § 13-6-11**

144.

Paragraphs 1 through 143 above are hereby incorporated as though each of the factual allegations was restated.

145.

Under O.G.C.A. § 13-6-11, a successful plaintiff may recover his or her attorneys' fees and other expenses of litigation where he specifically pleads and proves that the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense.

146.

Defendant has acted in bad faith and caused Plaintiff unnecessary trouble and expense by knowingly and intentionally discriminating against Plaintiff on the basis of his sex in his terms and conditions of employment and terminating Plaintiff in retaliation for his protected activity.

147.

As a direct and proximate result of Defendant's bad faith violation of Plaintiff's rights, Plaintiff has suffered unnecessary trouble and expense. These damages include court costs, reasonable attorneys' fees, and other litigation expenses, in an amount to be determined at trial by a jury.

**WHEREFORE**, Plaintiff demands a **TRIAL BY JURY** and for the following relief:

a) A declaratory judgment that the Defendant has engaged in unlawful discrimination on the basis of sex and retaliation in violation of Title IX;

b) A declaratory judgment that the Defendant has engaged in unlawful discrimination on the basis of sex and retaliation in violation of Title VII;

c) An injunction prohibiting the Defendant from engaging in unlawful discrimination on the basis of sex and retaliation in violation of Title IX;

d) An injunction prohibiting the Defendant from engaging in unlawful discrimination on the basis of sex and retaliation in violation of Title VII;

e) Award Plaintiff damages in an amount to be proved at trial for economic losses, damage to professional reputation, and pain and suffering that he has experienced as a result of Defendant's unlawful conduct;

f) Award Plaintiff punitive damages against the Defendant in an amount to be

proven at trial;

g)  Award Plaintiff pre-judgment and post-judgment interest;

h)  Award Plaintiff reasonable attorney's fees and costs; and

i)  Award Plaintiff other and further relief as the Court may deem appropriate.

Respectfully submitted this 6th day of November 2020.

**FRIED BONDER WHITE, LLC**

*/s/ David S. Fried*
David S. Fried
Georgia Bar No. 277319
730 Peachtree Street, NE
Suite 600
Atlanta, Georgia 30308
Phone: (404) 995-8808
Fax: (404) 995-8899
Email: dfried@friedbonder.com

Mark D. Schwartz (*pro hac application*
*forthcoming*)
Pennsylvania Bar No. 30527
Post Office Box 330
Bryn Mawr, Pennsylvania 19010
Phone: (610) 525-5534
Fax: (610) 525-5534
E-Mail: markschwartz6814@gmail.com

***Attorneys for Plaintiff***